```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF VIRGINIA
 2                         ROANOKE DIVISION

 3    UNITED STATES OF AMERICA,      )
                                     )
 4            Plaintiff,             )
          vs.                        )
 5                                   )  CRIMINAL NO.: 4:18-cr-11(12)
      JAQUAN LAMONT TRENT,           )
 6                                   )
              Defendant.             )
 7                                   )
      _____)
 8
                Transcript of Proceedings - Guilty Plea Hearing
 9          Before the Honorable CHIEF JUDGE MICHAEL F. URBANSKI
                            March 11, 2019
10                        Roanoke, Virginia

11    For the Plaintiff:

12        RONALD MITCHELL HUBER, AUSA
          UNITED STATES ATTORNEYS OFFICE
13        255 West Main Street, Room 130
          Charlottesville, Virginia  22902
14        434-293-4283
          Ron.Huber@usdoj.gov
15

16    For the Defendant:

17        PAUL SCOTT DeBRUIN, ESQUIRE
          DEBRUIN & LAYNE PC
18        PO Box 338
          Lynchburg, Virginia
19        434-847-3225
          debruinlaw@lynchburg.net
20


21
      _____
22
                    Mary J. Butenschoen, RPR, CRR
23               Federal Official Court Reporter
                          Roanoke, Virginia
24
      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25    PRODUCED BY COMPUTER.
```

1    (The proceedings commenced at 10:12 a.m.)

2              THE COURT:  Good morning.  Please call the case.

3              THE CLERK:  This is the *United States of America v.*

4    *Jaquan Lamont Trent, Criminal Action Number* 4:18-cr-11,

5    Defendant 11.

6              THE COURT:  Is the United States ready to proceed?

7              MR. HUBER:  Yes, Your Honor.

8              THE COURT:  Is the defendant ready to proceed?

9              MR. DeBRUIN:  Yes, Your Honor.

10             THE COURT:  Good morning, folks.  It's my

11   understanding that we are here to conduct a change of plea

12   hearing in this case and a Rule 11 guilty plea hearing.  Based

13   on what I have been told and the documents I've reviewed, it

14   is expected that the defendant will plead guilty to certain

15   charges in the first superseding indictment, namely, Count

16   One, which is the racketeering conspiracy charge.

17             Mr. Trent, before I call upon you to plead, the

18   Court must be satisfied that you possess a sufficient

19   understanding of your situation so as to make a knowing,

20   voluntary, intelligent and informed plea.  In that regard I'll

21   need to ask you certain questions and you will need to answer

22   them under oath.

23             Now, Mr. Trent, during this proceeding, if there is

24   some question asked or statement made that you do not

25   understand, I want you to stop the proceeding and let us know

1    that you do not understand it.  Likewise, if there is

2    something said that you do not agree with, you need to let me

3    and your lawyer know that you do not agree.

4          Now, if you don't speak up I'm going to assume that

5    you understand what's being said and that you agree with it.

6          Are we clear on that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Okay.  Now, let's ask the --

9    Mr. DeBruin, I'll ask you and your client to come to the

10   podium with the appropriate documents.

11         And let me ask the clerk the administer the oath to

12   Mr. Trent.

13         THE CLERK:  Mr. Trent, if you will raise your right

14   hand, please.

15                  JAQUAN LAMONT TRENT SWORN

16         THE COURT:  Mr. Trent, now that you've been sworn,

17   do you understand that you must answer all questions

18   truthfully?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  And that you if you answer any questions

21   falsely, any false answers may later be used against you in

22   another prosecution for perjury or making a false statement.

23         Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Okay.  I want to ask you some questions

1  directed to the issue of your competency.  The reason I ask

2  these questions is because this hearing is important to you.

3  And I want to make sure that you're clearheaded, alert, and

4  fully understand what's going on, okay?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Now, tell me what you remember name is.

7              THE DEFENDANT:  Jaquan Lamont Trent.

8              THE COURT:  And Mr. Trent, how old are you?

9              THE DEFENDANT:  25.

10              THE COURT:  Where are you from?

11              THE DEFENDANT:  Danville, Virginia.

12              THE COURT:  Okay.  And where were you born?

13              THE DEFENDANT:  Danville, Virginia.

14              THE COURT:  So you're a U.S. citizen.

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  How far did you get in school?

17              THE DEFENDANT:  I graduated.

18              THE COURT:  Which high school?

19              THE DEFENDANT:  George Washington high.

20              THE COURT:  Obviously, you speak English.

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  Okay.  Can you read and write English?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  Do you have any condition that I need to

25  be aware of, such as a hearing problem or something like that,

```
 1    that might make it difficult for you to understand the words
 2    we're speaking here in open court?
 3              THE DEFENDANT:  No, sir.
 4              THE COURT:  Have you ever been treated for any sort
 5    of emotional or mental problem?
 6              THE DEFENDANT:  No, sir.
 7              THE COURT:  Have you ever been diagnosed or treated
 8    for any sort of mental illness or problem at all?
 9              THE DEFENDANT:  No, sir.
10              THE COURT:  Anxiety, depression, anything at all?
11              THE DEFENDANT:  No, sir.
12              THE COURT:  Have you been treated for addiction
13    either to alcohol or a narcotic drug?
14              THE DEFENDANT:  No, sir.
15              THE COURT:  Have you taken any substances in the
16    past few days, any drugs, alcohol, intoxicants, prescription
17    medicines, in the past few days?
18              THE DEFENDANT:  No, sir.
19              THE COURT:  Have you taken anything legal or illegal
20    before coming here today that would affect your reasoning,
21    your judgment, your ability to understand?
22              THE DEFENDANT:  No, sir.
23              THE COURT:  Counsel, do you have an opinion with
24    regard to Mr. Trent's competency?
25              MR. DeBRUIN:  He's competent, Your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  Okay.  Now, Mr. Trent, have you received |
| 2 | a copy of the first superseding indictment in this case? |
| 3 | THE DEFENDANT:  Yes, sir. |
| 4 | THE COURT:  Do you have it there in front of you? |
| 5 | MR. DeBRUIN:  We do not have the superseding |
| 6 | indictment in front of us, Judge. |
| 7 | THE COURT:  Mr. Trent, I've given you my copy of the |
| 8 | first superseding indictment.  Have you seen that and gone |
| 9 | over it with your lawyer? |
| 10 | THE DEFENDANT:  Yes, sir. |
| 11 | THE COURT:  Okay.  Now, counsel, what have you done |
| 12 | to acquaint your client with the charges against him in this |
| 13 | case?  What have you done? |
| 14 | MR. DeBRUIN:  Your Honor, we have reviewed the |
| 15 | discovery, and I've informed my client of the discovery.  I |
| 16 | have gone through the elements of what the offenses are, what |
| 17 | the government needs to show.  One of the things initially |
| 18 | that we warrant is that my client has given a full statement |
| 19 | regarding his participation in this when he was arrested, so |
| 20 | we went over the statement with him. |
| 21 | So based upon that, he understood what he was |
| 22 | charged with and he expressed interest immediately about |
| 23 | trying to cooperate with the government. |
| 24 | THE COURT:  Okay.  Now, based on your discussions |
| 25 | with your client about the charges in the superseding |

1     indictment, are you in a position to waive its formal reading
2     or would you like to have the first superseding indictment
3     read into the record?
4              MR. DeBRUIN:  We'll waive.
5              THE COURT:  Mr. Trent, have you read the first
6     superseding indictment?
7              THE DEFENDANT:  Yes, sir.
8              THE COURT:  Have you had a chance to fully discuss
9     the charges in the first superseding indictment with your
10    attorney?
11             THE DEFENDANT:  Yes, sir.
12             THE COURT:  Do you believe you understand what
13    you're charged with in the superseding indictment?
14             THE DEFENDANT:  Yes, sir.
15             THE COURT:  And do you understand that the charges
16    in there against you are felonies?
17             THE DEFENDANT:  Yes, sir.
18             THE COURT:  Do you understand that pleading guilty
19    to one or more charges means that you're agreeing that you did
20    what those charges charge?
21             THE DEFENDANT:  Yes, sir.
22             THE COURT:  Okay.  Now, I understand there's a
23    written plea agreement in this case, correct?
24             THE DEFENDANT:  Yes, sir.
25             MR. DeBRUIN:  Yes.

```
1            THE COURT:  Do we have a copy of the plea agreement,
2    the signed plea agreement, there in front of Mr. Trent?
3            MR. DeBRUIN:  Yes, Judge.
4            THE COURT:  Okay.  Now, Mr. Trent, let me ask you
5    about this plea agreement.  Did you read it?
6            THE DEFENDANT:  Yes, sir.
7            THE COURT:  Did you go over the terms of the plea
8    agreement with your lawyer?
9            THE DEFENDANT:  Yes, sir.
10           THE COURT:  Okay.  This plea agreement is -- the
11   copy I have is 14 pages long; it's single spaced; there's a
12   lot of stuff in there, okay?
13           THE DEFENDANT:  Yes, sir.
14           THE COURT:  Did you go over every page of this with
15   your lawyer?
16           THE DEFENDANT:  Yes, sir.
17           THE COURT:  Did you have a chance to ask him
18   questions about various provisions of it?
19           THE DEFENDANT:  Oh, yes, sir.
20           THE COURT:  Okay.  So that you understood the terms
21   of the plea agreement?
22           THE DEFENDANT:  Yes, sir.
23           THE COURT:  Did you initial every page indicating
24   that you went over every page with your lawyer?
25           THE DEFENDANT:  Yes, sir.
```

```
1            THE COURT:  And did you sign it at the end
2    indicating that you agree to the terms of this plea agreement?
3            THE DEFENDANT:  Yes, sir.
4            THE COURT:  Okay.  What I want to do now is I want
5    to ask the -- Mr. Huber, the Assistant United States Attorney,
6    to come forward and go over the essential terms of the plea
7    agreement here in open court.
8            I do that in every case, Mr. Trent, because I want
9    you to hear out of the mouth of the government what they say
10   this agreement means, okay?
11           THE DEFENDANT:  Yes, sir.
12           THE COURT:  So if something doesn't sound right to
13   you, it would be time for you to let us know, okay?
14           THE DEFENDANT:  Yes, sir.
15           THE COURT:  Mr. Huber, you can come over by the edge
16   of the jury box and go over the essential terms of the
17   agreement, sir.
18           MR. HUBER:  Yes, sir.  Thank you, Your Honor.
19           THE COURT:  Good morning.
20           MR. HUBER:  The plea agreement that we ultimately
21   entered into is just slightly different than the one that we
22   gave to the Court, and the slight difference is in subsection
23   C5 there was a paragraph about the abandonment of seized
24   items.
25           THE COURT:  Okay.
```

1        MR. HUBER:  I think it was on page 9.  That does not

2   apply to him, so we've removed that paragraph.

3        THE COURT:  Okay.

4        MR. HUBER:  Other than that it's the same as the one

5   the Court has.

6        THE COURT:  All right.  Thank you.

7        MR. HUBER:  The plea agreement calls for Mr. Trent

8   to enter a guilty plea to Count One of the superseding

9   indictment.  Count One charges him with racketeering

10   conspiracy in violation of 18 U.S.C. 1962 paragraph D and

11   1963.  The maximum statutory penalty is set forth which is up

12   to 20 years incarceration, a fine of up to $250,000, or twice

13   the gross profits or other proceeds obtained directly or

14   indirectly for racketeering activity, plus a term of

15   supervised release of up to five years.

16        By signing the agreement he understands and agrees

17   that he knowingly conspired and agreed that a conspirator

18   would conduct and participate directly and indirectly in the

19   conduct of the affairs of the enterprise through a pattern of

20   racketeering activity.  And during and in furtherance of the

21   conspiracy he personally agreed to commit acts chargeable

22   under Virginia Code Section 18.232 and 18.222, the conspiracy

23   to commit murder statute; Virginia Code Sections 18.232, 25,

24   and 26, the attempted murder statute in Virginia; and 21

25   United States Code 841 and 846, the conspiracy to distribute

1    controlled substance, and in this case was marijuana.

2              Page 2 indicates that he agrees and acknowledges

3    that at the time of the plea of guilty to the criminal

4    activity that he was involved in and would be held responsible

5    for the conduct set forth in a statement of facts that we will

6    review with the Court shortly.  And that we would ask the

7    Court to incorporate with -- herein with this agreement.

8              He further agrees and will acknowledge at the time

9    of the plea of guilty to the criminal activity which is set

10   forth in Count One, including the conduct set forth therein,

11   and that he possessed and used firearms to facilitate the

12   commission of criminal activity and the affairs of the

13   enterprise.

14             He understands that he will have to pay a $100

15   special assessment for each felony count of conviction, which

16   in this case would be one.  He understands that upon entry of

17   the plea and he complies with the obligations set forth in the

18   plea agreement the United States will move at sentencing that

19   he be dismissed as a defendant in all the remaining counts.

20             The plea agreement sets forth a number of

21   constitutional rights that he has that he would be giving up

22   upon plea of guilty, and I understand the Court would be going

23   through each of those in more detail.  But to highlight the

24   first few, he understands that he's given up his right to

25   plead not guilty and persist in that plea.  He's giving up his

 1    right to a speedy and public jury trial, giving up his right

 2    to assistance of counsel at a trial and any subsequent appeal.

 3    He's giving up his right to remain silent at a trial, to

 4    testify at trial, or to confront and cross-examine witnesses

 5    that might be called by the government at such a trial.

 6           In terms of sentencing, the parties agree that the

 7    2018 edition of the United States Sentencing Guideline Manual

 8    applies.  He agrees to accept responsibility for his conduct,

 9    and if he complies with that obligation under the plea

10    agreement and accepts responsibility the United States will

11    recommend the Court grant him a two-level reduction in the

12    offense level pursuant to guideline Section 3E1.1(a) and we

13    will move to have a further reduction of one level in his base

14    offense level pursuant to United States Sentencing Guideline

15    3E1.1(b).

16           The parties agree that the sentencing hearing in

17    this case would not occur until after the trial in this case

18    and the trial in the related case of *United States v. Anthony*,

19    et al., Case Number 4:18-cr-12.

20           The substantial assistance paragraph -- standard

21    substantial assistance paragraph is included in the plea

22    agreement.  It has been explained -- paragraph explains to

23    Mr. Trent that only the government can make that motion for

24    substantial assistance and it's only the Court that can grant

25    that motion, and, ultimately, if that motion is granted it

1  will be the Court that determines what if any reduction to

2  give to him on his sentence based on substantial assistance.

3        Mr. Trent in the plea agreement is advised of his

4  right to appeal and that he is knowingly giving up that right

5  to direct appeal of his sentence and giving up --

6  notwithstanding any other language to the contrary, he is not

7  waiving his right to appeal or to have his attorney file a

8  notice of appeal as to any issue that cannot be waived under

9  law.

10        The same with the right to collaterally attack.

11  He's giving up his right to collaterally attack the judgment

12  except for under those conditions that cannot be waived under

13  the law.

14        There are -- paragraph D sets forth the remedies

15  available to the United States in the event that Mr. Trent

16  fails to comply with the terms of the plea agreement.  Those

17  could include declaring the plea agreement void, refusing to

18  dismiss any charges, the reinstatement of any dismissed

19  charges, the filing of new charges, and the withdrawal of any

20  substantial assistance motion which may have been made.

21        Finally, he indicates that he's consulted with his

22  attorney and fully understands his rights, that he's read the

23  plea agreement, carefully reviewed every part of it with his

24  attorney.  He understands the agreement and voluntarily agrees

25  to it.  He has signed and dated it, Mr. DeBruin has signed and

1    dated the plea agreement on behalf of his client, and I have

2    signed and dated the plea agreement on behalf of the United

3    States.

4              THE COURT:  Okay.  Thank you for that, Mr. Huber.

5              Now let me ask you, Mr. DeBruin, is that summary

6    consistent with your understanding of the terms of the plea

7    agreement?

8              MR. DeBRUIN:  Yes, Your Honor.

9              THE COURT:  And Mr. Trent, is that summary

10   consistent with your understanding as well?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Do you believe you understand the terms

13   of the plea agreement that you have signed?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Do you have any questions you want to

16   ask about the plea agreement?

17             THE DEFENDANT:  No, sir.

18             THE COURT:  Do you agree to the terms of the plea

19   agreement?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Do you want the Court to accept the plea

22   agreement?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Has anyone attempted to force you,

25   threaten you, pressure you, coerce you, make you plead guilty

1    to the charge of Count One, racketeering conspiracy, in this

2    case?

3              THE DEFENDANT:  No, sir.

4              THE COURT:  Are you pleading guilty of your own free

5    will?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Has anybody made you any promises or

8    assurances separate from or different than those set forth in

9    the written plea agreement?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Does the plea agreement represent in its

12   entirety your complete understanding with the United States?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  In addition to the penalties Mr. Huber

15   went over and that I will mention again in a minute, this plea

16   agreement will result in a felony -- if accepted by the Court

17   will result in a felony conviction, and that felony conviction

18   will have some impact on your civil rights, including the

19   right to vote, serve on a jury, possess any kind of firearm,

20   hold public office.

21             Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Count One of the first superseding

24   indictment charges racketeering conspiracy.  Mr. Huber went

25   over that.  Do you have any questions about the racketeering

1    conspiracy charge?

2            THE DEFENDANT:  No, sir.

3            THE COURT:  Mr. Huber, would you go over the

4    elements, please, for the racketeering conspiracy what the

5    government would have to prove?

6            MR. HUBER:  Yes, Your Honor.  Count One charges that

7    the racketeering conspiracy -- charges the conspiracy to

8    participate in a racketeering enterprise in violation of the

9    federal racketeering law commonly known as RICO, an acronym

10   for the Racketeer Influenced and Corrupt Organization Act.

11           First the government would have to establish that a

12   conspiracy existed.  To establish a conspiracy, the government

13   would have to establish beyond a reasonable doubt each of the

14   four following elements:

15           First, that the defendant was a member of the

16   conspiracy charged in Count One of the indictment.

17           2, that after the defendant joined the conspiracy

18   and while he was still a member of it one or more of the other

19   members committed the substantive offense, in this case, RICO.

20           3, that the substantive offense was committed in

21   furtherance of or to help advance the conspiracy.

22           And 4, that the substantive offense, that is RICO,

23   was within the reasonable foreseeable scope of the conspiracy.

24   The offense must have been one that the defendant could have

25   reasonably anticipated as necessary or natural consequence of

1    the agreement.

2             With respect to the RICO elements of a RICO charge,

3    there are three:

4             1, that an agreement existed between two or more

5    persons to participate in the conduct of the affairs of an

6    enterprise that affected interstate commerce through a pattern

7    of racketeering activity.

8             2, that the defendant deliberately joined or became

9    a member with knowledge of its purpose.

10            And 3, that the defendant knowingly agreed that the

11   defendant or some other member of the conspiracy would commit

12   at least two acts of racketeering.

13            THE COURT:  All right.  Have you gone over those

14   elements and what the government would have to prove to get a

15   conviction in this case with your lawyer, Mr. Trent?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  And you understand the government, in

18   order to get a conviction, would have to prove facts

19   consistent with each of those elements beyond a reasonable

20   doubt?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Okay.  Now, Mr. Huber went over the

23   penalties, and I will go over them again with you now.

24            It's a fine of up to $250,000 or twice the gross

25   profits or other proceeds obtained from the racketeering

1    activity, a period of incarceration of not more than 20 years,

2    and a period of supervised release of up to five years.  And

3    I'll talk about supervised release more in a minute.  There's

4    also a $100 mandatory special assessment.

5              Those are the consequences of your plea.  Do you

6    understand those potential penalties?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Have you gone over the penalties with

9    your lawyer?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Have you gone over with your lawyer the

12   United States sentencing guidelines and how the Court arrives

13   at a sentence in your case?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Okay.  And let me just preview for you

16   the procedure that the Court will use in arriving at a

17   sentence in this case.

18             The first thing that the Court will do is the Court

19   will ask probation to prepare a presentence report.

20   Presentence report is a detailed document which provides me

21   more information about both the crime involved here and about

22   your life than I have now, okay?  It will give me a lot of

23   information which will allow me to render a sentence that's

24   consistent with the statute in this case.

25             Now, you'll get a copy of the presentence report.

1   In fact, you'll be asked to provide information for it and

2   your lawyer may be present at any such interview with

3   probation.  The government will also provide information to

4   the probation officer.  You'll get a copy of the presentence

5   report.  You and your lawyer will get a chance to look at it,

6   make any necessary corrections.  If there's some things in

7   there you think are wrong, then you can object to them.

8            One of the things the presentence report does is it

9   calculates the advisory sentencing guidelines.  The advisory

10  sentencing guidelines is this book right here, and this is the

11  2018 version of it, and this contains sentencing guidelines

12  for all federal crimes.  And the guidelines are arrived at by

13  considering really two things.  1, well, what's the crime

14  involved?  And that is given an offense -- a numerical offense

15  level.  And then what's Mr. Trent's criminal history.  That's

16  given another criminal history category.  And then there is a

17  guideline range that is determined based on that.

18           Have you gone over the sentencing guidelines with

19  your lawyer?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  Okay.  Once I get the presentence report

22  and I see what the probation officer recommends that the

23  guidelines will be, you and your lawyer and the government

24  will have a chance to object and argue about whether they --

25  those guidelines were applied correctly, and we'll deal with

1     any of those issues at sentencing.

2           The guidelines right now are not mandatory on me.

3     They are advisory.  What that means is they are a place for me

4     to start in thinking about the sentence in this case.  Right

5     now we know what the confines of any period of incarceration

6     are going to be.  Generally, the outer bounds is from zero

7     years to 20 years.  That's where it falls.  That's what the

8     statute says is the low end and the top end, zero to 20.  And

9     so the guidelines will come up with some range and within that

10    it's a place for me to start.

11          Once I get the guideline range and I make my

12    guidelines findings at sentencing, then I'm required under the

13    law to apply a number of other factors to determine a sentence

14    in this case.  First thing I have to consider is, well, what's

15    the crime?  What happened here?  And what was Mr. Jaquan

16    Trent's role in that crime?  What did he do, okay?

17          Then I need to consider other things, such as how

18    has Mr. Jaquan Trent lived his life?  What has he done?

19    What's his prior criminal history?  What's his educational

20    background?  What's his physical and mental health?  What's

21    his family situation?  Lots of things I have to think about

22    that I don't know about that now.  That will be in the

23    presentence report.

24          I also ask the government and your lawyer to give me

25    a sentencing memo, a written document a week before sentencing

1    that will give me other information about you that may not be
2    in the presentence report, and I always find those helpful to
3    give me additional information about you.  Very often attached
4    to the sentencing memo are letters of support from friends and
5    family members, and I always read those to give me a better
6    picture of your life.  I'll also allow anybody who wants to
7    come and testify at your sentencing to come and do that, okay?
8              Now, did you have a question you wanted to ask me?
9              THE DEFENDANT:  Yes, sir.  What about my teachers?
10   Can they write letters?
11             THE COURT:  Absolutely.  Anybody can write me a
12   letter.  Friends, family members, teachers, anybody --
13   pastors.  Anybody who wants to write letters I'll always read
14   them, okay?
15             THE DEFENDANT:  Okay.
16             THE COURT:  And I find those helpful, too, to give
17   me a sense for how you've lived your life, okay?
18             THE DEFENDANT:  Yes, sir.
19             THE COURT:  And so I will consider all of that and
20   then I will consider a number of other factors that are --
21   such as the seriousness of the offense, the need for the
22   sentence imposed to promote respect for the law, provide just
23   punishment, keep you and others from committing similar
24   crimes, protecting the public and other factors.
25             So there's a lot for me to consider, and I don't

1    know today right now where your sentence will fall, okay?  I

2    know it will be between zero and 20 and the fine is up to

3    $250,000.  I don't know where that will fall.  I need more

4    information.  I'll get that in the presentence report.  I'll

5    get that in the information that you and the government

6    provide, and we'll determine that at sentencing in this case.

7            So if you plead guilty here today and I accept it,

8    you're not going to be allowed to withdraw that guilty plea

9    simply because at sentencing the sentence may be greater than

10   you might expect.  In other words, at the end of the day, the

11   sentencing is up to the Court.

12           Do you understand that?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Okay.  Now, and you and your lawyer may

15   have predicted and talked about and thought about what would

16   be a fair sentence in this case, but, if the sentence is

17   different than that, you -- you will not be allowed to

18   withdraw your guilty plea.

19           Do you understand that?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  And in fact, you agree in this plea

22   agreement not to appeal any sentence I give you.

23           Do you understand that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Okay.  Now, you understand that the

1    sentencing in this case is going to be a little ways off.

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  It's going to be after -- you know,

4    we've got a trial in the fall in one case, and then we've got

5    a trial in the related Anthony case set for early next year.

6    And you understand your sentencing is going to be after both

7    of those trials.

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Okay.  Now, there's no parole under the

10   federal system and parole has been abolished.  So if you are

11   sentenced to a period of months or years, you will serve that

12   entire term less any good time that might be calculated by the

13   Bureau of Prisons.  I don't have anything to do with the good

14   time calculation.  That's up to the Bureau of Prisons.  So as

15   far as I'm concerned, whatever the Court sentences you to,

16   that's what you'll serve.

17             Do you understand that?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Okay.  Now, I talked about supervised

20   release, and there's a period of supervised release provided

21   for in the statute of up to five years.

22             Supervised release is a period after you've finished

23   your incarceration sentence, if you get one, and that is a

24   period in which you will have to be out on good behavior and

25   you'll have to follow the rules of probation officers.  You'll

1    have to make sure you don't commit any additional crimes, that

2    you don't have anything to do with firearms, that you don't

3    have anything to do with illegal drugs, and that you follow

4    all the rules that the probation officers set down.

5            Do you understand that after the sentence is served

6    there's a period of supervised release?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  And that period is intended to allow you

9    to come back into society in a transitional manner, let

10   probation help you, and let probation monitor you to make sure

11   that you're not getting back into trouble.

12           Do you understand that?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Okay.  Now, if you do get back into

15   trouble while you're on supervised release, if you violate the

16   law again, have anything to do with guns or drugs, or you

17   don't follow what probation is telling you or you take off and

18   you don't tell them where you are, they can issue a violation

19   notice and have you brought back before me and you could be

20   put back in prison for a violation of the terms of your

21   supervised release.  And that's after you've finished your

22   sentence.

23           Do you understand that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Okay.  Now, any questions about anything

we've gone over so far?

                THE DEFENDANT:  No, sir.

                THE COURT:  All right.  Let's talk about what you're
giving up in this plea agreement, okay?

                THE DEFENDANT:  Okay.

                THE COURT:  By pleading guilty you're giving up some
valuable constitutional rights.  You're giving up your right
to trial.  You're giving up your right to have 12 folks sit in
that jury box right there and decide whether the government
can prove its case against you beyond a reasonable doubt.  You
don't have to prove anything in a trial.  You are presumed
innocent.  You have a right to remain silent and not have that
silence used against you.  The government bears the burden of
proof and the government bears the burden in order to get a
conviction of getting 12 folks unanimously to agree that you
are guilty beyond a reasonable doubt.

                At that trial you would have the right to the
assistance of counsel.  At that trial you would have the right
to see the government's witnesses from the witness stand,
cross examine them, and then bring in documents, persons and
things by subpoena to assist in your defense.  You would have
all those constitutional rights associated with a trial.  But,
by pleading guilty and signing the plea agreement and pleading
guilty, you waive your right to jury trial and there will be
no trial.

1          Do you understand that?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Okay.  The second thing you give up in

4     this plea agreement, and it's on page -- it's at the bottom of

5     page 7, top of page 8, you give up your right to appeal.  In

6     fact, this says that you instruct your lawyer not to file an

7     appeal in this case.  In other words, whatever sentence I give

8     you, that's what you get.

9          Do you understand that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  Now, you are not waiving any

12     right to appeal something that the law does not allow you to

13     waive.

14          Well, what does that mean?  Well, if I were to

15     sentence you, for example, beyond the 20 years that the law

16     allows, or if I were to sentence you based on some

17     constitutionally impermissible factor such as your age, your

18     race or sex or something like that, or your national origin,

19     well, you could appeal that, all right?  But I'm not going to

20     do either of those things, all right?  And so you are

21     essentially giving up your right to appeal.

22          Do you understand that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Okay.  The next thing you give up, and

25     it's on page 8 of the plea agreement, is a right to

1    collaterally attack the judgment.

2            Well, what in the world does that mean?  A

3    collateral attack means a right -- it means the exercise of

4    your right to file a document called a petition for writ of

5    habeas corpus.  And it's a document that folks who are

6    incarcerated can file with the Court under the constitution

7    that says let me out of prison.  There is something wrong with

8    what happened to me, okay?  There's something wrong with the

9    process.  Let me out.

10           Well, you give up your right to file a petition for

11   a writ of habeas corpus in this plea agreement.  And you --

12   and that applies for any reason except for a claim that cannot

13   be waived by law, and we've covered that, or for a claim that

14   your lawyer has in some respect been constitutionally

15   ineffective.

16           So you give up in this plea agreement your right to

17   jury trial in its entirety and, except in narrow exceptions,

18   your right to appeal and your right to file a habeas corpus

19   petition or collaterally attack the judgment.

20           Do you understand those rights that you're giving up

21   in this plea agreement?

22               THE DEFENDANT:  Yes, sir.

23               THE COURT:  Understanding those rights, do you still

24   want to plead guilty consistent with the written plea

25   agreement in this case?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Okay.  Now, are you fully satisfied with

3     the advice and representation provided to you by your counsel

4     in this case?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Okay.  Now, Mr. Trent, we've gone over a

7     lot of things here at this hearing so far.  Is there anything

8     else you've got any question about that you want to ask me

9     about before we go further?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Okay.  Let me ask the United States to

12    present the facts it would be prepared to prove were this case

13    to go to trial.

14             MR. HUBER:  Thank you, Your Honor.  Again, the

15    statement of facts that you have is just slightly modified to

16    correct tenses and what have you.  We've got a signed

17    agreement that's at counsel's table.

18             THE COURT:  All right.

19             MR. HUBER:  The parties stipulate that the

20    allegations contained in the first superseding indictment and

21    the following facts are true and correct and that had this

22    matter gone to trial the United States would have proven each

23    of the facts beyond a reasonable doubt.

24             Jaquan Lamont Trent admits the statement of facts

25    does applicably include all facts known to him regarding the

events charged in the first superceding indictment.  At all times relevant to the first superseding indictment Jaquan Lamont Trent also known as "Hatch" was an associate of the criminal organization, the Rollin 60s Crips, or "Rollin 60s", which is a criminal street gang.  Since at least sometime in or about 2015 the Rollin 60s have been active in the Western District of Virginia and have engaged in criminal history, including but not limited to murder and attempted murder, assault resulting in bodily injury, assault with a dangerous weapon, robbery, obstruction of justice, drug trafficking and trafficking in firearms, and conspiracy to commit those crimes.

The Rollin 60s, including its leadership, membership, and associates, constitutes an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated-in-fact.  The enterprise constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise has engaged in, and its activities have affected, interstate and foreign commerce.

The purpose of the enterprise include: promoting and enhancing the enterprise, and enriching its members and associates through, among other things, acts of violence, including murder, trafficking in firearms, and trafficking in

controlled substances, and the enforcement of discipline among
the members; providing assistance to members of the enterprise
who committed crimes for and on behalf of the enterprise; and
thwarting efforts of law enforcement to apprehend enterprise
members.

At all times Trent was an associate of the Rollin
60s and was often called "Hatch."  Trent was involved in
attempted murders committed on behalf of the enterprise, as
well as gun and drug trafficking committed on behalf of the
enterprise.

From within or about sometime in 2015, in the
Western District of Virginia and elsewhere, Trent and others,
being persons employed by and associated with the Rollin 60s,
an enterprise which was engaged in, and the activities of
which affected interstate and foreign commerce, knowingly and
intentionally did combine, conspire, confederate and agree
with each other, and with persons known and unknown, to
violate Title 18, United States Code, Section 1962(c), that
is, to conduct and participate, directly and indirectly, in
the conduct of the affairs of the enterprise through a pattern
of racketeering activity, as that term is defined by Title 18,
United States Code, Section 1961(1) and 1961(5), consisting of
multiple acts involving:

A, Murder, chargeable under Virginia Code, Sections
18.23-2, 22, 26, and 18 and the common law of Virginia; and

multiple offenses involving trafficking in controlled

substances in violation of 21 U.S.C. Sections 841 and 846.

In furtherance of the conspiracy and to achieve its

objectives, Trent performed and caused to be performed certain

racketeering activity in the Western District of Virginia and

elsewhere.  The racketeering activity performed by Trent

included but is not limited to:

A.  His association with the Rollin 60s Crip.  Trent

is a brother of Deshaun Trent (also known as "DaDa" or "Six")

and a cousin of Kevin Trent, Jr., (aka "Benji" or "Gates" or

"6owie" or "Bad Ass") and Kanas Trent, (aka "LA").  Deshaun

Trent, Kevin Trent, Jr., and Kanas Trent are all members of

the Rollin 60s.  At all times relevant to the first

superseding indictment, the head of the Rollin 60s was Marcus

Davis (also known as "Sticcs").  At all times relevant to the

first superseding indictment, other members of the Rollin 60s

included Phillip Miles (also known as "R"), Shabba Chandler

(also know as "Trill"), Matthew Ferguson (also known as "MC"),

Laquante Adams (also known as "Spazz"), Wyshawn Brandon (also

known as "Mr. Man"), and Stevie Johnson, Jr., also known as

"No Good", among others.  Ashley Ross was the girlfriend of

Miles and is the mother of one of his children.  At some point

in 2016, Ross lived at Southwyck Apartments, which is known as

North Hills Court.  Southwyck Apartments is located in

Danville, Virginia.  At Ross's apartment, Trent and other

members of the Rollin 60s would hang out at Ross's apartment.

Not well written.

At some point in 2015, Trent legally purchased a .45 caliber Glock firearm.  Trent knowingly has loaned this firearm to Deshaun Trent to use on different occasions, and has seen Deshaun Trent, Kevin Trent, Jr., Kanas Trent, Miles, Chandler, Ferguson, and Adams carrying a firearm.  In 2016, Miles asked Trent to purchase a firearm for Miles, which Trent declined to do.  Johnson also asked Trent to purchase a firearm for him.

In 2016, Trent lived with Dashaun Trent and Tredarius Keene (also known as "Bubba") at an apartment on Parker Road in Danville.  Keene is a member of the Milla Bloods street gang.  Keene stored firearms at the Parker Road apartment.  Keene, Dashaun Trent, and Miles frequently hung out together.

Trent grew up in the "800" neighborhood of Danville, Virginia, which is an area just south and east of Green Street and which encompasses Calquhoun, Lee, Paxton, and Cabell Streets as well as Berryman Avenue.  The "800" neighborhood is known as the territory of the Rollin 60s.  Members of the Rollin 60s kept a "trap house" on Lee Street.  With the term "trap house" generally describing, as in this case, a house used by gang members to hang out, conduct gang business, and traffic in drugs and firearms.

Members of the Rollin 60s would hang out at this house, have gang meetings, and different gang members lived there from time-to-time.  Danville, Virginia, is located in the Western District of Virginia.

B.  Conspiracy to murder Ekong Eshiat in December 2015.

Robert "Jay" Kennedy is from the 800 neighborhood. In 2015, Kennedy was shot.  Based on the statements of a witness, individuals believed Kennedy had been shot by a member of the rival Billys Bloods street gang named Ekong Eshait.  Shortly after the shooting, Trent was at the Rollin 60s's trap house on Lee Street smoking marijuana and hanging out.  While he was there, Trent heard Dashaun Trent and others discuss retaliating against the rival gang member by shooting him, and observed Dashaun Trent, Miles, Ferguson, Keene, and others whom Trent cannot remember arm themselves with firearms in order to do so.  Trent left the trap house.  The incident and the retaliatory shooting that occurred afterwards appeared to spark and escalate a gang war between the Rollin 60s and Billys.

Subsection C.  Attempted murder of Dwight Harris and Armonti Womack on June 15 of 2016.

On or about June 15, 2016, Trent was at his apartment on Parker Road hanging out with Tyson Bowens (also known as Ty Savage), Dashaun Trent, Wydshawn Brandon, (aka

"Mr. Man"), and Miles.  At some point that night, Miles

received a telephone call.  Miles then informed the group that

Kevin Trent, Jr., was in an argument at North Hills Court with

two individuals known as the "Philly Boys".  In response,

Bowens, Dashaun Trent, Brandon, Miles, and Trent traveled to

North Hills Court in Miles's black Impala.  Bowens drove the

vehicle.  Trent sat in the backseat between Miles and Brandon,

with Dashaun Trent in the front passenger's seat.  Dashaun

Trent, Brandon, Miles, and Trent were armed.  Trent carried a

semi-automatic rifle that had been in the Parker Road

apartment on the couch.  The other carried pistols.

When the group arrived at North Hills Court, they

stopped at the entrance of the apartment complex, where they

met six to seven other black males.  Trent only recognized an

individual named "Shon Don" who was the Big Homie of the Milla

Bloods.  Trent tied a T-shirt around his face to disguise his

identity and saw other individuals partially cover their faces

with red bandanas, blue bandanas, and black T-shirts.  Some

individuals wore hoodies to help disguise themselves.  The

group planned to walk into the North Hills Court apartment

complex and shoot and kill the Philly Boys.

From the area near the entrance to North Hills

Court, Trent and the group walked into the apartment complex,

disguised and armed.  The group walked towards the building

where Ashley Ross lived.  As Trent walked forward, he saw

1  Kevin Trent, Jr., and Tanasia Coleman (also known as Nasia)

2  near two cars and two individuals, believed to be the Philly

3  Boys.  Trent believes the first shots came from the area where

4  Kevin Trent, Jr., was standing.  At that point, Trent began

5  firing his rifle and heard others firing around him.  During

6  the shooting, Trent fired his rifle until the 30-round clip

7  was empty.  Trent saw Kevin Trent, Jr., and Dashaun Trent

8  firing their weapons.  He did not see a weapon in Coleman's

9  hands.

10         Trent ran back towards Miles's black Impala, where

11  Bowens was waiting.  Dashaun Trent, Miles, Bowen, Brandon, and

12  Trent returned to Trent's apartment on Parker Road.  At some

13  point, Ross, Coleman, and Keene arrived.  Coleman's hand had

14  been injured in the shooting.  Keene stated that, during the

15  shooting, he was in Ross's apartment, that he was firing from

16  Ross's living room window, and that he hit one of the Philly

17  Boys.  Miles collected the firearms in order to dispose of

18  them to avoid detection by law enforcement.

19         The shooting improved the reputation of the Rollin

20  60s Crips around Danville, as the gang seemed violent.  Trent

21  recalls that during this time frame everyone wanted to be a

22  Rollin 60s Crip and started wearing blue bandanas.

23         Finally, Subsection D talks about conspiracy to

24  distribute controlled substances.

25         During and in furtherance of the conspiracy, Trent

1     conspired with others to distribute, and did in fact

2     distribute, marijuana on behalf of the racketeering

3     enterprise.  Specifically, Deshaun Trent and others sold

4     marijuana to Trent.  Trent has also seen Deshaun Trent, Kevin

5     Trent, and Kanas Trent sell marijuana to others.

6          Each of the acts set forth above in paragraphs A, B,

7     C, and D above furthered the goal and objectives of the

8     enterprise by enriching Trent and its members and associates,

9     and enhancing the status of Trent and others within the

10    organization.

11         The actions taken by Trent as described above were

12    taken willfully, knowingly, and with the specific intent to

13    violate the law.  Trent did not take these actions by

14    accident, mistake, or with the belief that they did not

15    violate the law.  Trent acknowledges that the purpose for the

16    foregoing statement of facts is to provide an independent

17    factual basis for his guilty plea.  It does not necessarily

18    identify all persons with whom the defendant might have

19    engaged in illegal activity.

20         And then I have signed it on behalf of the United

21    States.  Underneath my signature there's a paragraph

22    indicating that:  After consulting with my attorney and

23    pursuant to the plea agreement entered into this day, I

24    stipulate the above statement of facts is true and accurate,

25    and that had the matter proceeded to trial, the United States

1     would have proven the same beyond a reasonable doubt.

2               Mr. Trent has signed that.

3               And then there's a paragraph indicating that Mr.

4     DeBruin is the attorney for Mr. Trent, that he has carefully

5     reviewed the above statement of facts, and to his knowledge

6     his decision to stipulate to the facts is informed and a

7     voluntary one, and then he has signed that.

8               THE COURT:  Okay.  Thank you for that, Mr. Huber.

9               Mr. DeBruin, any dispute about those facts just

10    presented?

11              MR. DeBRUIN:  No, Your Honor.

12              THE COURT:  Mr. Trent, you've heard a summary of the

13    evidence against you.  Did you hear anything in that summary

14    with which you disagree?

15              THE DEFENDANT:  Hold on.  I'm trying to find it.  I

16    can't find it.

17              It's fine.

18              THE COURT:  Well, did you do the things that are set

19    forth in this statement of facts that it indicates that you

20    did?

21              THE DEFENDANT:  Some of them.

22              THE COURT:  Okay.  Well, this statement of facts

23    indicates that you were associated, on page 2, with the Rollin

24    60s Crips.  Is that true?  Were you a member of the Rollin 60s

25    Crips gang?

```
1              THE DEFENDANT:  I'm not a member.
2              MR. DeBRUIN:  He just said that he was an associate,
3    Judge, not a member.
4              THE COURT:  That's fair enough.  Were you associated
5    with folks who were members of the Rollin 60s Crips?
6              THE DEFENDANT:  Grew up in the same neighborhood.
7              THE COURT:  Grew up in the same neighborhood, okay.
8    And that you were cousins of or brothers to other members, to
9    folks who were members of this gang, correct?
10             THE DEFENDANT:  Correct.
11             THE COURT:  Okay.  Now, in paragraph A on page 2 it
12   indicates you purchased a firearm and loaned it to folks who
13   were members of the Rollin 60s Crips; is that correct?
14             THE DEFENDANT:  Actually, my brother only carried my
15   firearm.  He was legal to carry.  There's no law to say that
16   you can't carry a firearm if you are not a convicted felon and
17   if the firearm is not stolen and you know who it belonged
18   to.
19             THE COURT:  All right.  So you purchased a firearm
20   and gave it to your brother?
21             THE DEFENDANT:  No, it was my gun.
22             THE COURT:  You purchased a gun.
23             THE DEFENDANT:  I purchased a gun.  I had it, but, I
24   mean, he have carried it before.
25             THE COURT:  Okay.  You purchased a gun and your
```

1    brother carried it.

2              THE DEFENDANT:  Yeah, he carried it on his person,

3    yeah.

4              THE COURT:  Okay.  All right.  This says you have

5    seen Dashaun Trent, Kevin Trent, Jr., Kanas Trent, Miles,

6    Chandler, Ferguson, and Adams carrying firearms.

7              THE DEFENDANT:  Yeah, they carried firearms.  They

8    ain't carry my firearm.

9              THE COURT:  This says you loaned your firearm to

10   Dashaun Trent, your brother, correct?

11             THE DEFENDANT:  I wouldn't technically call it

12   loaning.  He's my brother.

13             THE COURT:  All right.  Did you -- you bought a gun.

14   It was yours, right?

15             THE DEFENDANT:  Correct.

16             THE COURT:  And how did your brother get it?

17             THE DEFENDANT:  I gave it to him.  I let him hold

18   it.

19             THE COURT:  Okay.  You let him hold it.

20             THE DEFENDANT:  Yeah.

21             THE COURT:  All right.  So you let him hold it.

22   Fair enough, okay.  I got that, all right?  Okay.

23             Now, and you lived in 2016 with your brother Dashaun

24   and also with Tredarius Keene, who was a member of the Milla

25   Bloods street gang; is that right?

1          THE DEFENDANT:  Correct, for awhile.

2          THE COURT:  Okay.  For awhile.

3          THE DEFENDANT:  Bubba was there for a short period

4    of time.  He couldn't pay the rent.

5          THE COURT:  Okay.  Now, paragraph B says that you

6    were present when there was some discussions regarding taking

7    some action against this Ekong Eshait because they thought he

8    had shot Robert J. Kennedy; is that right?

9          THE DEFENDANT:  Correct.

10          THE COURT:  Okay.  Now, paragraph C is an important

11    paragraph, because it says that you were present at the

12    attempted murder of Dwight Harris and Armonti Womack on June

13    15, 2016.

14          THE DEFENDANT:  Correct.

15          THE COURT:  Were you there?

16          THE DEFENDANT:  Yeah, I were there.

17          THE COURT:  Did you come in the Impala carrying a

18    semi-automatic rifle?

19          THE DEFENDANT:  AR-15.

20          THE COURT:  And did you shoot the AR-15 at the

21    vehicle that came into the --

22          THE DEFENDANT:  Yeah.

23          THE COURT:  Let's see, the --

24          THE DEFENDANT:  I didn't shoot at no vehicle.

25          THE COURT:  Well, you shot your rifle.

1          THE DEFENDANT:  Yeah, I did.

2          THE COURT:  And what did you shoot your rifle at?

3          THE DEFENDANT:  I shot them at two people.

4          THE COURT:  You shot them at two people.

5          THE DEFENDANT:  I didn't shoot them, though.  I

6     didn't hit nothing.

7          THE COURT:  You shot at Dwight Harris and Armonti

8     Womack.

9          THE DEFENDANT:  Correct.

10          THE COURT:  With the AR-15.

11          THE DEFENDANT:  Correct.

12          THE COURT:  And you emptied the clip.

13          THE DEFENDANT:  Correct.

14          THE COURT:  You don't think you hit them, though.

15          THE DEFENDANT:  I know I didn't.

16          THE COURT:  Well, they got hit.

17          THE DEFENDANT:  It wasn't by my rifle.

18          THE COURT:  And how do you know that?

19          THE DEFENDANT:  Because he would have died.  A .223?

20          THE COURT:  Because you had the AR-15 rifle,

21     correct?

22          THE DEFENDANT:  Correct.  A .223?

23          THE COURT:  You and a bunch of the other guys there,

24     these gang members, were shooting at these two people, right?

25          THE DEFENDANT:  Correct.

```
1              THE COURT:  Okay.  Now, were you also involved with
2     others in distributing marijuana on behalf of the gang?
3              THE DEFENDANT:  I have sold marijuana before.
4              THE COURT:  Okay.  And have you done that to benefit
5     the racketeering enterprise, the Rollin 60s Crips?
6              THE DEFENDANT:  Well, yeah.
7              THE COURT:  Okay.  All right.  So you agree with
8     those matters that we have gone over associated in this
9     statement of facts.
10             THE DEFENDANT:  Yes.
11             THE COURT:  Did you go over this statement of facts
12    with your lawyer?
13             THE DEFENDANT:  Yes, sir.
14             THE COURT:  Okay.  And did you sign it?
15             THE DEFENDANT:  Yes, sir.
16             THE COURT:  Agreeing that had this -- agreeing, one,
17    that the statement of facts is true and accurate, and had the
18    matter proceeded to trial the government would have proved the
19    same beyond a reasonable doubt.
20             THE DEFENDANT:  Yes, sir.
21             THE COURT:  Is that true?
22             THE DEFENDANT:  Yes, sir.
23             THE COURT:  Okay.  Now, are you in fact guilty of
24    what's charged in Count One of the first superseding
25    indictment?
```

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Okay.  And are you pleading guilty of

3    your own free will?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Counsel, based on your investigation of

6    the facts of this case, your understanding of your client,

7    what took place in connection with the indictment, do you

8    believe your client's plea of guilty is well-advised and

9    consistent with those facts?

10             MR. DeBRUIN:  Yes, Your Honor.

11             THE COURT:  Okay.  Mr. Trent, following on the

12   written plea agreement in this case, how do you plead to Count

13   One which charges racketeering conspiracy in the first

14   superseding indictment?

15             THE DEFENDANT:  Guilty.

16             THE COURT:  Listen to the clerk while she reads you

17   the written guilty plea form.

18             THE CLERK:  Mr. Trent, it reads:  In the presence of

19   Paul Scott DeBruin, my counsel, who has fully explained the

20   charges contained in the first superseding indictment against

21   me, and having received a copy of the first superseding

22   indictment from the United States Attorney before being called

23   upon to plead, I hereby plead guilty to said first superseding

24   indictment and Count One thereof.  I have been advised of the

25   maximum punishment which may be imposed by the Court for this

1   offense.  My plea of guilty is made knowingly and voluntarily

2   and without threat of any kind or without promises other than

3   those disclosed here in open court.

4          MR. DeBRUIN:  Your Honor, I'm also handing back the

5   indictment, the plea agreement, and the stipulation of

6   facts.

7          THE COURT:  Thank you, Mr. DeBruin.

8          It is the finding of the Court in the case of *United*

9   *States v. Jaquan Lamont Trent* that the defendant is fully

10  competent and capable of entering an informed plea.  He's

11  aware of the nature of the charges and the consequences of his

12  plea.  His plea of guilty is knowing, voluntary, and supported

13  by an independent basis in fact as to the essential elements

14  of the offense.  I accept the plea and plea agreement and find

15  the defendant guilty of that offense.  And that is the offense

16  being Count One, racketeering conspiracy in violation of 18

17  United States Code, Sections 1962(d) and 1963.

18         A written presentence report will be prepared by

19  probation to assist me in sentencing and I ask probation to

20  prepare it.  Again, you'll be given a copy of the report.  You

21  and your lawyer will be able to go over it and make any

22  necessary corrections and objections to it.

23         I will set this matter for hearing after these two

24  trials are conducted and you'll be given an opportunity to --

25  to speak at that -- at your sentencing hearing and tell me

1    whatever it is you want to tell me about this case.  I'll also

2    listen to any other witnesses you want to bring or read any

3    statements that you want to have brought in on your behalf.

4    Any victims of the crime will be afforded an opportunity to be

5    heard at the hearing.

6            Now, the defendant, as I understand it, is in

7    custody; is that right?

8            MR. DeBRUIN:  That's correct, Your Honor.

9            THE COURT:  Okay.  He will remain in custody pending

10   the sentencing in this case.  Is there anything else that we

11   need to take up at this time from the government?

12           MR. HUBER:  Your Honor, we would ask that the PSR

13   not be prepared until after the trial dates.

14           THE COURT:  Yeah.  I think that makes --

15           MR. HUBER:  That's what we've been doing with the

16   other cases.

17           THE COURT:  Yeah, there's no sense in probation --

18   well, let me -- I will order it.  I'll order the preparation

19   but will stay that order until after the Davis and the Anthony

20   trials, because it doesn't make sense to do anything

21   otherwise, okay.

22           MR. HUBER:  Thank you.

23           THE COURT:  Anything else from you, Mr. DeBruin?

24           MR. DeBRUIN:  No, Your Honor.

25           THE COURT:  Madam clerk?

1            Mr. Trent?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Your name is Jaquan Lamont Trent?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Okay, but the initials you put down are

6    LJT.

7            Lamont Jaquan Trent.  I can put JLT.

8            THE COURT:  No, I just want to --

9            THE DEFENDANT:  It's me.

10           THE COURT:  I was curious as to why you put LJT

11   instead of JLT.

12           THE DEFENDANT:  I don't know.  I can change it if

13   you want.

14           THE COURT:  No, it doesn't matter.  This is what I

15   want to ask you, okay?  I'm going to hand you this plea

16   agreement and hand you this statement of facts, and I want you

17   to look at it, and I want you to look at each page and confirm

18   that those are in fact your initials, okay?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  All right.  Thank you, Kristin.

21           And that you initialed each of those pages.  That's

22   what I want to know.

23           THE DEFENDANT:  Yes, sir.  Yes, sir.

24           THE COURT:  Okay, great.  Thank you.

25           Anything else we need to take up at this hearing,

1    Mr. Huber?

2              MR. HUBER:  No, sir, thank you.

3              THE COURT:  Mr. DeBruin?

4              MR. DeBRUIN:  No, Your Honor.

5              THE COURT:  Mr. Trent, do you have any questions at

6    all about what's gone on at this hearing?

7              THE DEFENDANT:  No, sir.

8              THE COURT:  Okay.  I will -- you take care of

9    yourself.  I will see you again, all right?

10             Ask the marshal to declare a recess.

11             THE MARSHAL:  All rise.

12   (The proceedings concluded at 11:10 a.m.)

13                         CERTIFICATE

14             I, Mary J. Butenschoen, certify that the foregoing

15   is a correct transcript from the record of proceedings in the

16   above-entitled matter.

17   /S/ Mary J. Butenschoen                        4/25/2019

18

19

20

21

22

23

24

25